1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   CARLOS HERNANDEZ OLIVERA,      )   Civil No. 09cv1558 JLS (RBB)
                                    )
12                     Plaintiff,   )
                                    )   **REPORT AND RECOMMENDATION**
13                                  )   **DENYING PLAINTIFF'S MOTION FOR**
                                    )   **SUMMARY JUDGMENT [ECF NO. 12]**
14   v.                             )   **AND GRANTING DEFENDANT'S**
                                    )   **CROSS-MOTION FOR SUMMARY**
15                                  )   **JUDGMENT [ECF NO. 14]**
                                    )
16   MICHAEL J. ASTRUE, Commissioner)
     of Social Security,            )
17                                  )
                                    )
18                     Defendant.   )
     ───────────────────────────────)
19

20                  **I.   PROCEDURAL BACKGROUND**

21       On February 21, 2006, Plaintiff, Carlos Hernandez Olivera

22   ("Olivera"), filed an application for disability insurance benefits

23   ("DIB") claiming a disability onset date of December 11, 2002.

24   (Admin. R. Attach. #2, 26, ECF No. 9.)  His claim was denied

25   initially, and the denial was upheld by the Social Security

26   Administration ("SSA") after reconsideration.  (Id. at 26; id.

27   Attach. #3, 80-81.)  A hearing was held before Administrative Law

28   Judge Edward Steinman on February 5, 2009.  (Id. at Attach. #2, 26,

                                    1

37-79.)  He issued a written decision on February 19, 2009, finding Olivera was not disabled.  (_Id._ at 36.)  The denial of benefits became final when the Appeals Council upheld the ALJ's decision on May 14, 2009.  (_Id._ at 1-3.)

On July 17, 2009, Plaintiff filed a Complaint for Judicial Review & Remedy on Administrative Decision Under the Social Security Act against Michael J. Astrue, Defendant Commissioner of Social Security, challenging the denial of Plaintiff's claim for disability insurance benefits [ECF No. 1].  Defendant filed an Answer on February 2, 2010 [ECF No. 7] and filed the Administrative Record the same day [ECF No. 9].  The Court issued an Order Setting Deadline for Filing Pretrial Motions [ECF No. 10], but Plaintiff's Motion for Summary Judgement was not timely filed.  An Order to Show Cause why the Court should not recommend that the Complaint be dismissed for failure to prosecute was issued on June 14, 2010 [ECF No. 11].  Plaintiff responded to the Order to Show Cause on June 21, 2010, by filing a Motion to Extend Time to File Motion for Summary Judgment along with a Motion for Summary Judgment [ECF No. 12].  Defendant did not reply to the Order to Show Cause; the Court vacated the Order, granted Plaintiff's request for an extension of time, and set a hearing date for the Motion for Summary Judgment [ECF No. 13].

On July 19, 2010, Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment were filed as a single document [ECF No. 14].

The Court finds this matter is suitable for decision without oral argument pursuant to Civil Local Rule 7.1(d)(1).  S.D. Cal. Civ. L.R. 7.1(d)(1).  For the reasons set forth below, the Court

recommends **DENYING** Plaintiff's Motion for Summary Judgment [ECF No. 12] and **GRANTING** Defendant's Cross-Motion for Summary Judgment [ECF No. 14].

## II.   MEDICAL EVIDENCE

The majority of the medical evidence regarding Olivera's mental condition was part of his workers' compensation case.  On April 19, 2004, Psychiatrist Stephen Singer issued a Medical-Legal Evaluation of Olivera, who he had examined on January 23, 2004.[1] (Admin. R. Attach. #8, 587-97, ECF No. 9.)  The doctor conducted a mental status exam and found Plaintiff to be pleasant, cooperative, and appropriately dressed and groomed.  (Id. at 590.)  Dr. Singer observed that "[Olivera's] mood was mildly depressed and while his affect was appropriate and consistent with his mood it was slightly flattened."  (Id. at 591.)  The doctor described Plaintiff's cognition as "grossly intact for attention, concentration, language, short and long term memory."  (Id.)  Olivera did not suffer from any thought disturbances or perception disorders. (Id.)

Dr. Singer ruled out certain diagnoses:  (1) depression, major, single, mild to moderate; (2) adjustment disorder with depression; and (3) posttraumatic stress disorder, mild.  (Id. at 594.)  But he found that Olivera had a compression fracture and suffered from sexual dysfunction and premature ejaculation.  (Id.) The psychiatrist gave Plaintiff a global assessment of functioning ("GAF") score of sixty to sixty-five.  (Id.)  Dr. Singer concluded

---

[1] Although Plaintiff filed this suit as "Carlos Hernandez Olivera," many of the medical records identify him as "Carlos Hernandez."  For the sake of consistency, the Court has identified the Plaintiff as "Olivera" rather than "Hernandez."

that "[w]hile [Olivera] has some mild depressive symptoms, these are not of a degree that would interfere with his being able to engage in vocational rehabilitation." (Id. at 596.)  "He does not have a disability that would interfere with his ability to engage in these activities and no permanent partial disability is anticipated." (Id.)

On October 12, 2004, almost nine months after Dr. Singer examined Plaintiff, Dr. Robert Zink prepared a Report of Psychological Testing of Olivera. (Id. Attach. #7, 523-30.)  The doctor noted that Plaintiff "achieved borderline to low average scores" in the Wechsler Adult Intelligence Scale. (Id. at 524-25.) Olivera's "Bender memory was 5-1/2 items, which [was] in the approximate average range for this test of visual memory." (Id. at 525.)  A Millon Clinical Multiaxial Inventory showed that Plaintiff may overstate his symptoms, but he had "underlying dependent personality factors with avoidant features." (Id.)  The test also "suggest[ed] generalized anxiety, somatoform features, depression, and possible Post Traumatic Stress features." (Id.)  Long term depression and negativistic features were both ruled out.  (Id.) Several Beck inventories showed moderate to severe levels of anxiety, severe perceptions of depression, and moderate levels of pessimism about his future.  (Id. at 528.)

Dr. Zink also evaluated Olivera's work functions. (Id.)  He found that Plaintiff's "[c]oncentration [did] not appear significantly impaired . . . . [h]owever considering the degree of emotional distress, he may still experience occasional concentration impairment during escalations of the emotional distress." (Id. at 528-29.)  The doctor found that Olivera's

4

memory was not impaired, but his visual and scanning speed was "a little lower than one would expect . . . and this may be [a] result of momentary mental concentration impairment." (Id. at 529.) Additionally, Plaintiff's IQ functioning was also "a little lower then what would be expected . . . ." (Id.) Dr. Zink concluded that there was likely a mental impairment, but he deferred the question of whether it presented a disability to Dr. Brickman, the principal examiner. (Id.)

On October 27, 2004, Dr. Brickman, a psychiatrist, completed his Agreed Medical/Legal Evaluation in Psychiatry of Olivera. (Id. at 532-45.) He noted Plaintiff's chief complaints and the history of his illness. (Id. at 535-37.) The doctor also reviewed the medical evidence including doctor visits, psychological tests, and mental status examinations. (Id. at 537-43.) Dr. Brickman concluded that Plaintiff suffered from (1) major depressive disorder, single episode, moderate; (2) pain disorder associated with psychological factors and a general medical condition; (3) panic disorder without agoraphobia; and (4) premature ejaculation. (Id. at 543.) He explained that Olivera remained temporarily, partially psychiatrically disabled and required appropriate psychiatric treatment. (Id. at 544.) Although his symptoms had worsened since Dr. Singer's April 19, 2004 report, there was insufficient evidence to find Plaintiff temporarily, totally psychiatrically disabled. (Id.) Dr. Brickman stated, "[Olivera's] [d]epression is such that, for the moment, I doubt that he could participate adequately with [v]ocational [r]ehabilitation." (Id. at 545.)

Plaintiff saw Dr. Louis Fontana, a psychiatrist, for an initial psychiatric consultation on December 17, 2004.  (Id. at 314.)  The doctor performed a mental status exam on Olivera.  (Id. at 318.)  Plaintiff made good eye contact, was cooperative, and did not exaggerate or embellish his comments during the interview.  (Id.)  His mood was dysphoric.  (Id.)  He was sad and cried while speaking about his financial situation.  (Id.)  Olivera's "[s]peech [was] of normal tone and meter[,]" and his "[t]hought processes [were] logical and goal-directed."  (Id.)  The doctor found no evidence of hallucinations or delusions, and Plaintiff denied having suicidal thoughts.  (Id.)  With regard to his intellectual functioning, "[Olivera] [was] oriented in all spheres."  (Id.)  His "[i]mmediate, recent and remote memory appear[ed] intact[,]" and his knowledge, judgment, and insight were all adequate.  (Id.)

Dr. Fontana diagnosed Plaintiff with multiple psychological disorders:  (1) major depressive disorder, single episode, moderate; (2) pain disorder associated with both psychological factors and a general medical condition; (3) panic disorder without agoraphobia; (4) post-traumatic stress disorder, chronic, mild; (5) male erectile disorder; and (6) premature ejaculation.  (Id. at 319-20.)  The doctor also noted that the psychological testing performed by Dr. Zink revealed dependant and avoidant personality factors.  (Id. at 320.)  Dr. Fontana "agree[d] with Dr. Brickman, in that [Olivera] would be unable to participate currently in vocational rehabilitation secondary to his psychiatric symptoms."  (Id.)  The doctor concluded that Plaintiff was temporarily, partially psychiatrically disabled.  (Id.)

Olivera was seen by Dr. Fontana on December 31, 2004, January 21, February 3, March 3, April 14, June 9, July 8 and 29, August 19, September 23, and November 18, 2005.  (Id. at 303-13.) Throughout his treatment, the doctor's diagnosis of Olivera did not change.  (Id.)  Except for the meetings in December 2004, in which the doctor explicitly found Olivera was temporarily, partially disabled, Dr. Fontana referred to Dr. Brickman's agreed medical evaluation to describe Plaintiff's psychological disability status. (Id. at 303-13, 321.)

On May 23, 2005, Dr. Roberto Netter evaluated Olivera and completed a psychological consultation report on June 15, 2005. (Id. Attach. #8, 554-68.)  The doctor reviewed Olivera's records and asked him about his current physical and psychological symptoms, his injury, other sources of stress, and his personal history.  (Id. at 554-63.)

Then, the psychologist conducted a mental status evaluation. (Id. at 563-66.)  The doctor noted that Olivera "maintained slightly limited eye contact, and his face alternated between being passively expressionless and openly dysphoric with profuse tears." (Id. at 563-64.)  Plaintiff was polite and cooperative, but his mood was "dysphoric."  (Id. at 564.)  Olivera was alert and showed no signs of perceptual impairment or thought disorder, but "[h]is thought processes were slow."  (Id.)  He was properly oriented, displayed good judgment, had an average level of intelligence and a low-average level of socio-cultural sophistication.  (Id.) Olivera's insight into his psychological difficulties and functioning was limited, and "[h]is memory was slightly impaired, in association with psychomotor retardation."  (Id.)  Plaintiff was

a reliable historian with "signs of minor distortions favoring his own perspective noted . . . ."  (Id.)

Dr. Netter performed some psychological testing on Plaintiff and found that he had "slight-to-moderate self-perceived anxiety, depression, and hopelessness; contrasting with moderate-to-severe anxiety and moderate depression when self-report[ed] . . . ."  (Id. at 564-65.)  Olivera was diagnosed with posttraumatic stress disorder, adjustment disorder with depressed mood, pain disorder associated with both psychological factors and a general medical condition, and psychological factors affecting a medical condition including hypertension and elevated cholesterol.  (Id. at 565.)  The doctor noted psychological stressors including dealing with the workers' compensation system and related economic hardships.  (Id.)  Plaintiff was given a GAF score of fifty and was found temporarily, partially psychiatrically disabled.  (Id. at 565-66.)  Dr. Netter explained, "At this time, [Olivera] is precluded from engaging in work that would lead to increased psychologically-mediated exacerbated physical pain, for such will lead to increased anxiety and depression, and maintenance of this vicious cycle."  (Id. at 567.)

On October 3, 2005, Dr. Netter prepared a psychological treatment report for Olivera.  (Id. at 607-12.)  The doctor found that Plaintiff still exhibited pain behaviors, he had predominately neutral facial expressions with occasional unresponsiveness, he felt constricted, his mood was guardedly depressed and anxious, his speech was low in amplitude and modulated, and the content of his thought was limited and reflected marked helplessness.  (Id. at 610.)  Olivera's eye contact was slightly limited, which was an

improvement.  (Id.)  His thought process was slow, and his memory
in association with psychomotor retardation was slightly impaired,
which was also an improvement.  (Id.)  He had slight-to-moderate
anxiety and depression.  (Id.)

   The doctor diagnosed Plaintiff with posttraumatic stress
disorder, major depressive disorder, pain disorder associated with
psychological factors and a general medical condition, and
psychological factors affecting a medical condition including
hypertension and elevated cholesterol.  (Id.)  Olivera was given a
GAF score of fifty and found to be temporarily, partially
psychiatrically disabled.  (Id. at 610-11.)

   On June 17, 2006, Dr. Romulado Rodriguez, a psychiatrist,
performed a complete psychiatric evaluation of Plaintiff.  (Id.
Attach. #7, 355-61.)  The mental status exam included the doctor's
observations of Olivera's appearance, thought process, speech,
mood, and intellect as well as a memory test, concentration and
calculation exercise, and the doctor inquired into Plaintiff's
knowledge of current events, meaning of proverbs, ability to
explain similarities between different objects and his judgment.
(Id. at 358-59.)  Dr. Rodriguez diagnosed Plaintiff with dysthmic
disorder and noted that "[p]sychosocial stressors over the past
year [were] [m]inimal."  (Id. at 559-60.)  He assessed Olivera's
GAF score at seventy and concluded that he had no functional
limitations. (Id. at 360.)

   On June 26, 2006, a psychiatric review technique form was
completed by Disability Evaluation Analyst Jamias and approved by
Dr. Amado.  (Id. at 363-74.)  Plaintiff was found to have an
affective disorder that was not severe.  (Id. at 363, 374.)

9

1  Specifically, Plaintiff had dysthymic disorder.  (<u>Id.</u> at 366.)
2  Plaintiff was found to have mild restrictions on daily living, mild
3  difficulty in maintaining social functioning, and mild difficulties
4  in maintaining concentration, persistence, and pace.  (<u>Id.</u> at 371.)

5      On August 14, 2006, Dr. Singer examined Olivera and reported
6  on the initial psychiatric evaluation on September 29, 2006.  (<u>Id.</u>
7  Attach. #8, 617-21.)  Plaintiff was pleasant, cooperative, and
8  neatly dressed.  (<u>Id.</u> at 620.)  The doctor noted that Olivera "did
9  not show psychomotor retardation or agitation or any eccentricities
10 of behavior."  (<u>Id.</u>)  He appeared worried and anxious, but his
11 affect was appropriate and consistent with his mood.  (<u>Id.</u>)  He had
12 no thought disturbances in form or content, and no disorder of
13 perception.  (<u>Id.</u>)  "[C]ognition was grossly intact for attention,
14 concentration, language, short and long term memory."  (<u>Id.</u>)  Dr.
15 Singer diagnosed Plaintiff with depression, major, single,
16 moderate, and panic disorder.  (<u>Id.</u>)  He gave Olivera a GAF score
17 of fifty to sixty and explained that he had "significant depression
18 with recurrence of symptoms after discontinuation of his medication
19 even though he has continued to consult with Dr. Netter."  (<u>Id.</u>)
20 Dr. Singer performed employee work status evaluations on June 5,
21 August 14, and September 15, 2006.  (<u>Id.</u> at 622-23, 625.)  The
22 doctor indicated that Plaintiff should remain off of work.  (<u>Id.</u>)

23     Dr. Zink prepared a report of psychological retesting on
24 October 11, 2006.  (<u>Id.</u> at 629-35.)  Olivera received low average
25 to average scores on several subtests from the Wechsler Adult
26 Intelligence Scale III, and "[t]his was a mild improvement over the
27 scores of October 2004 . . . . ."  (<u>Id.</u> at 631.)  The digit symbol
28 subtest indicated Plaintiff had no "substantial loss of mental

concentration ability at the time he completed the test." (<u>Id.</u>)
Olivera had no signs of organic dysfunction. (<u>Id.</u>)  A Millon
Clinical Multiaxial Inventory produced results similar to those
from 2004 and showed that Plaintiff may overstate some of his
symptoms and he likely had "dependant, avoidant, and socially
withdrawn personality characteristics." (<u>Id.</u> at 632.)  From 2004
to 2006, Olivera's self-reporting of anxiety increased from
moderate to severe, but his depression level decreased from severe
to moderate, and his hopelessness score also decreased from
moderate to mild. (<u>Id.</u> at 634.)

　　　Dr. Zink ruled out posttraumatic stress disorder but found
"significant residual anxious, depressive, and somatoform
features." (<u>Id.</u> at 635.)  "Dependent, avoidant, and socially
withdrawn personality factors [were also] suggested by the Millon."
(<u>Id.</u>)  With regard to work functions, the doctor found that (1)
Plaintiff's concentration was not substantially impaired, but he
may still experience occasional impairment during emotional
distress; (2) his memory was unimpaired; (3) Olivera's visual
scanning/speed was not substantially impaired; and (4) Plaintiff's
IQ functioning was in the low average to average range. (<u>Id.</u>)

　　　On October 31, 2006, Dr. Brickman wrote an agreed medical
reevaluation in psychiatry for Olivera. (<u>Id.</u> at 656-65.)
Plaintiff's subjective factors of disability included "pessimism,
demoralization, [and] minor avoidant characteristics." (<u>Id.</u> at
662.)  The doctor diagnosed Olivera with (1) posttraumatic stress
disorder that was in partial remission; (2) major depressive
disorder, single episode, work related; and (3) pain disorder
associated with both psychological factors and a general medical

1    condition, chronic.  (<u>Id.</u> at 659-61.)  Plaintiff was permanent and

2    stationary and had a GAF score of 63.5.  (<u>Id.</u> at 661.)

3         Dr. Brickman completed a psychiatric disability impairment

4    form and evaluated limitations on Olivera's work functioning.  (<u>Id.</u>

5    at 664-65.)  He found that Plaintiff's abilities to perform complex

6    or varied tasks, relate to other people beyond giving and receiving

7    instruction, and accept and carry out responsibility for direction,

8    control and planning were all slightly limited.  (<u>Id.</u>)  Plaintiff's

9    abilities to influence other people and to maintain a work pace

10   appropriate to a given work load were very slightly limited.  (<u>Id.</u>)

11   Olivera had minimal limitations on his abilities to comprehend and

12   follow instruction, perform simple and repetitive tasks, and make

13   generalizations, evaluations, or decisions without immediate

14   supervision.  (<u>Id.</u>)

15        The doctor concluded, "I do not believe that [Olivera], on the

16   basis of a work-related, <u>purely</u> Psychiatric Disability, is

17   currently incapable of returning to his usual and customary

18   occupation . . . ."  (<u>Id.</u> at 662 (emphasis in original).)  Dr.

19   Brickman found that Plaintiff was no longer temporarily disabed.

> There is no indication that [Olivera] was ever
> Temporarily Totally Psychiatrically Disabled over
> the years; onset of Temporary Partial Psychiatric
> Disability (Major Depressive Disorder/Post-
> Traumatic Stress Disorder/Adjustment
> Disorder/Sexual Dysfunction) occurred (formally,
> supported by records) at the time of [Olivera's]
> first evaluation by Dr. Singer, the Treating
> Psychiatrist, on January 23, 2004.  Applicant's
> Temporary Partial Psychiatric Disability is now
> at an end.

26   (<u>Id.</u> at 661.)

27        Dr. D. J. Williams reviewed a psychiatric case summary of

28   Plaintiff on April 25, 2007, and affirmed the initial decision that

Olivera did not suffer from a severe mental impairment.  (Id.
Attach. #7, 398.)  The last day that Plaintiff was eligible for
Social Security disability benefits was December 31, 2007.  (Id.
Attach. #2, 27.)

On February 3, 2009, two days before the administrative
hearing, Dr. Jaga Glassman, a psychiatrist, conducted a psychiatric
disability evaluation of the Plaintiff.  (Id. Attach. #8, 682-89.)
The doctor reviewed Olivera's history and considered his current
medications and daily activities.  (Id. at 683-86.)  He found
Olivera "well-engaged with the examiner, making and maintaining
good eye contact."  (Id. at 686.)  Plaintiff had low energy, was
apathetic, preoccupied, and "considerably depressed-appearing."
(Id.)  He showed some variation in affect, and no significant
anxiety during the interview; generally, his mood was "sour, sad,
with low energy and somewhat low motivation."  (Id. at 687.)
Plaintiff did not display psychotic symptoms, and his "responses
were coherent, relevant, and goal-directed . . . ."  (Id.)  "He was
able to follow all instructions without difficulty."  (Id.)  The
doctor found that Olivera had "low-average to borderline
intellectual functioning."  (Id.)

Dr. Glassman diagnosed Plaintiff with (1) pain disorder with
medical and psychological factors; (2) major depression, moderate,
ongoing; (3) anxiety disorder, not otherwise specified; and (4)
possible panic disorder with phobic avoidance.  (Id. at 689.)  He
found "possible borderline intellectual functioning" and assigned
Olivera a GAF score of fifty.  (Id.)  Dr. Glassman concluded, "It
will be difficult for this man to be able to return to productive,
full-time work, given his combination of problems. . . .  His

13

ongoing depression and anxiety is likely to impair his capacity to
retrain successfully in a nonphysical type of employment." (Id.)

### III. THE ADMINISTRATIVE HEARING

On February 5, 2009, the administrative hearing was held
before ALJ Steinman. (Id. Attach. #2, 39.)  Olivera and his
attorney, Mr. Jackson, were present.  (Id.)  Judge Steinman heard
testimony from Olivera; Dr. Gurvey, a medical expert; and Dr.
Jesko, a vocational expert.  (Id.)

At the hearing, Plaintiff testified that he could not work due
to his back injury and psychiatric problems. (Id. at 42.)  Judge
Steinman questioned Olivera about his back condition and pain.
(Id. at 42-47.)  Plaintiff's attorney also questioned him about
limitations caused by his back problems and pain.  (Id. at 47.)

The administrative law judge asked Dr. Gurvey about Olivera's
back injury and whether Plaintiff had any physical limitations as a
result.  (Id. at 48-50.)  The medical expert testified that Olivera
"could occasionally lift and carry 20 pounds, frequently lift and
carry 10 pounds.  He could sit, stand, and walk six out of eight
hours with the usual breaks.  There would be no restriction with
regard to push/pull."  (Id. at 49.)  The doctor stated that
"[p]osturally [Plaintiff] should not climb ladders, scaffolds, or
ropes."  (Id.)  Olivera could occasionally crawl and he had "[n]o
other restrictions.  Manipulative, environmentally, or
audiovisually . . . ."  (Id. at 50.)  Plaintiff's attorney also
questioned the medical expert regarding Olivera's physical
limitations.  (Id. at 50-53.)

The ALJ presented several hypothetical questions to the
vocational expert, Dr. Jesko.  (Id. at 54-62.)  The judge's first

hypothetical included certain physical limitations due to degenerative disc disease. (<u>Id.</u> at 54.)  Judge Steinman's second hypothetical added the psychiatric diagnosis of dysthmic disorder (depression) and a GAF score of seventy. (<u>Id.</u> at 55.)  With a third hypothetical, the judge added more physical limitations and asked the vocational expert to give examples of jobs that would be available to that individual. (<u>Id.</u>)  Dr. Jesko testified that the individual could be a garment folder, small parts assembler, or a gluer. (<u>Id.</u> at 55-56.)

Judge Steinman posed another hypothetical and added the minimal and slight mental limitations from Dr. Brickman's psychiatric evaluation of Olivera from 2006. (<u>Id.</u> at 57.)  The vocational expert explained that the jobs she previously identified were "simple and repetitive[,] one and two step" positions, so they were not affected by the additional mental limitations. (<u>Id.</u> at 58.)

The administrative law judge presented another hypothetical to Dr. Jesko that included certain physical limitations. (<u>Id.</u> at 59.) Judge Steinman then stated, "I'm going to give him the benefit of the doubt.  Let's just limit him to simple repetitive [tasks]." (<u>Id.</u>)  He also added the restrictions of limited contact with the general public and coworkers." (<u>Id.</u> at 60.)  The vocational expert testified that the individual would be able to perform the three jobs she previously identified. (<u>Id.</u>)

Next, Olivera's attorney questioned the vocational expert. (<u>Id.</u> at 62-79.)  Attorney Jackson noted that Dr. Glassman gave Plaintiff a GAF score of fifty and asked, "Would it be fair to extrapolate those restrictions to a GAF score of 50 . . . ?" (<u>Id.</u>

1  at 67.)  The vocational expert explained that it "would be beyond

2  [her] expertise[,]" and the question would be better answered by a

3  psychologist or psychiatrist.  (Id.)

4       Plaintiff's counsel next posed a hypothetical using Dr.

5  Netter's report dated May 23, 2005.  (Id. at 67-71.)  The judge

6  interjected and read a portion of the report.  "It's reasonably

7  expected Mr. [Olivera] will not be able to return to his customary

8  work duties secondary to residual symptoms of post-traumatic stress

9  disorder."  (Id. at 70.)  The report continued, "At this time, he's

10 precluded from engaging in work that would lead to increased

11 psychologically mediated exacerbated physical pain for such would

12 lead to increased anxiety and depression and maintenance of this

13 vicious cycle."  (Id.)  The vocational expert responded that it was

14 difficult to answer the hypothetical because pain is subjective.

15 (Id.)  She asked that the hypothetical include the level of work

16 that would exacerbate his pain.  (Id.)  Judge Steinman suggested

17 using Olivera's testimony regarding his physical limitations.  (Id.

18 at 70-71.)  The vocational expert responded that the individual

19 would not be able to perform any work under those circumstances.

20 (Id.)

21                    **IV.  THE ALJ'S DECISION**

22      After considering the record, ALJ Steinman concluded that

23 Olivera suffered from two severe impairments:  degenerative disc

24 disease, status post-fracture of the L1 vertebrae, and depression.

25 (Id. at 27.)  He also made the following relevant findings:

26

27               Louis A. Fontana, M.D., reported on December
                 17, 2004, that the claimant was seen for a
                 psychiatric consultive examination.  The claimant
28               complained of back pain with radiation to his
                 buttocks and at time to his feet, as well as

16

sexual problems and nightmares of his fall.  He
began having flashbacks and panic symptoms.  After
examination, the claimant was diagnosed with
single episode, moderate major depressive
disorder; pain disorder associated with both
psychological and a general medical condition;
panic disorder without agoraphobia; chronic, mild
posttraumatic stress disorder ("PTSD"), and
erectile disorder.

At the request of the California Department
of Social Services, the claimant was seen by
Romualdo R. Rodriguez, M.D., for a clinical
psychiatric consultive examination.  Dr. Rodriguez
reported on June 17, 2006, that the claimant
stated he had not been able to work since his
accident or look for jobs due to his back pain.
He complained of developing depression and he had
settled his worker's compensation case in 2002 for
$20,000.  After examination, the claimant was
diagnosed with dysthymic disorder and a Global
Assessment of Functioning ("GAF") of 70 indicating
some mild symptoms or some difficulty in social,
occupational, or school functioning.

Jaga N. Glassman, M.D., reported on February
3, 2009, that the claimant was seen at the request
of the California Department of Social Services
for a psychiatric disability evaluation.  The
claimant stated that it had been a while since he
had seen a doctor.  The claimant complained of low
back pain and depression and that his thought
processes were not clear.  He stated that he could
not stay in one position long and that activity
aggravated his pain.  He was not in any kind of
psychiatric or mental health treatment and no
history of psychiatric hospitalizations or suicide
attempts.  He only had over the counter
medications for pain.  On examination, he was
depressed appearing.  The claimant was diagnosed
with pain disorder with medical and psychological
factors, ongoing moderate major depression,
anxiety disorder not otherwise specified, possible
panic disorder with phobic avoidance, possible
borderline intellectual functioning, and a GAF of
50.

The undersigned took into consideration all
the claimant's other diagnosed conditions and
finds that there is minimal clinical evidence to
corroborate or support any finding of significant
vocational impact related [to] them.

4.  Through the date last insured, the
claimant did not have an impairment or combination
of impairments that met or medically equaled one

17

of the listed impairments in 20 CFR Part 404,
Subpart P, Appendix 1 (20 CFR 404.1525 and
404.1526).

. . . .

The claimant's mental impairment did not meet
or medically equal the criteria of listing 12.04.
In making this finding, the undersigned has
considered whether the "paragraph B" criteria were
satisfied.  To satisfy the "paragraph B" criteria,
the mental impairment must result in at least two
of the following:  marked restriction of
activities of daily living; marked difficulties in
maintaining social functioning; marked
difficulties in maintaining concentration,
persistence, or pace; or repeated episodes of
decompensation, each of extended duration.  A
marked limitation means more than moderate but
less than extreme.  Repeated episodes of
decompensation, each of extended duration, means
three episodes within 1 year, or an average of
once every 4 months, each lasting for at least 2
weeks.

. . . Dr. Rodriguez reported on June 17,
2006, that the claimant is able to dress and
undress himself, drive a car, run errands, go to
the store, cook, participate in household chores,
go for walks, watch television, handle cash, and
pay bills.  Dr. Glassman reported on February 3,
2009, that the claimant is able to perform his
self grooming, help with household chores, wash
dishes, pick up, go grocery shopping, help his
wife at the Laundromat, rake leaves, go for walks,
and watch television.

In social functioning, the claimant had mild
difficulties.  The claimant reported that he lived
with his wife and child, talked over the telephone
with people and met them socially, and went to
church.  Dr. Fontana reported on December 17,
2004, that the claimant lived with his wife and
two children. . . . Dr. Glassman reported on
February 3, 2009, that the claimant was married
and worked with his wife in daily activities.

With regard to concentration, persistence or
pace, the claimant had moderate difficulties.  His
cognitive ability and memory are intact and the
medical reports indicate that he functions at a
higher level that would allow him to do basic work
activity.  The undersigned notes that the claimant
went into great detail answering his adult
function report and disability report.  This is
indicative of an ability to maintain an acceptable

level of concentration to perform at least simple tasks.

As for episodes of decompensation, the claimant had experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairment did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied.

The undersigned has also considered whether the "paragraph C" criteria were satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  There are no extended episodes of decompensation and the claimant is not expected to decompensate with an increase in mental demands.  Moreover, he does not need to live in a highly structured living arrangement.

. . . .

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is not able to climb ladders, ropes, or scaffolds; can occasionally crawl; and is limited to nonpublic, simple, repetitive work that requires limited contact with coworkers.

. . . .

In terms of the claimant's alleged disabling impairments, the record fails to document any objective clinical findings establishing that the claimant was not able to perform work in light of the reports of the treating and examining practitioners and the findings made on examination.

. . . Dr. Fontana reported on December 17, 2004, that . . . . [claimant's] thought processes were logical and goal directed and there was no evidence of hallucinations or delusions.  He was oriented in all spheres and his immediate, recent, and remote memory was intact.  Dr. Rodriguez reported on June 17, 2006, that the claimant was coherent and organized and there was no tangentiality or loosening of associations.  He was relevant and nondelusional.  He denied any

auditory or visual hallucinations.  He was alert and oriented in all spheres. . . . Dr. Glassman reported on February 3, 2009, that the claimant stated that he could perform a very simple job that was not physically demanding and would allow him to change position frequently.  He had no evidence of anxiety and was able to follow instructions.

. . . .

As for the opinion evidence, Robert Netter, Ph.D., reported on June 15, 2005, that the claimant had a GAF of 50.  On September 26, 2006, Stephen F. Signer, reported that the claimant had a GAF of 50-60.  Dr. Brickman reported on October 31, 2006, that the claimant had a GAF of 63.5.  Pursuant to 20 CFR § 404.1527 and Social Security Ruling 96.2p, the undersigned assigns significant weight to this opinion, as it is well-supported by the medical evidence finding that the claimant has moderate mental impairment symptoms.

Chris S. Pallia, M.D., reported on February 14, 2003, through August 6, 2003, that the claimant was totally temporarily disabled. . . . Louis A. Fontana, M.D., reported on December 17, 2004, that the claimant was temporarily partially psychiatrically disabled.  J. Brand Brickman, M.D., reported on October 12, 2004, that the claimant was temporarily partially psychiatrically disabled.  A treating physician's medical opinion, on the issue of the nature and severity of impairment, is entitled to special significance; and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight. However, statements that a claimant is 'disabled', 'unable to work' can or cannot perform a past job, meets a listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the Dictionary of Occupational Titles.  Such issues are reserved to he Commissioner.  Furthermore, the record fails [to] support the doctor's opinion that claimant is incapable of all work.

. . . .

On October 12, 2004, Robert Zink, Ph.D., reported testing revealed that the claimant was not significantly impaired in concentration, had unimpaired memory, a little lower that one would

20

expect visual scanning/speed and borderline to low average IQ functioning.

Dr. Brickman and Dr. Zink reported on October 11, 2006, that the claimant did not appear to have substantially impaired concentration or visual scanning/speed, unimpaired memory, and IQ functioning in the low average to average range.

Pursuant to 20 CFR § 404.1527, the undersigned assigns significant weight to these examining doctor's opinions, as they are well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations.  Moreover, their opinions are not inconsistent with other substantial evidence of record.

Dr. Rodriguez reported on June 17, 2006, that the claimant had a GAF of 70 and was stable on his psychiatric medications.  He was found to have no mental functional limitations.

Dr. Glassman reported on February 3, 2009, that the claimant had a GAF of 50 and that it would be difficult for him to return to productive full time work given his combination of problems and it would be difficult for him to return to strenuous, physical labor.  His ongoing depression and anxiety was likely to impair his ability to retrain successfully in a nonphysical type of employment.  He had limited intellectual functioning that further impaired his capacity for flexibility and adaptability and creative change.

The undersigned, per SSR 96-6p considered these options because they were based upon a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein.  Although the state agency consultant opined that the claimant had first no mental limitations and then disabling mental impairments, the claimant's medical condition indicates moderate limitations. Moreover, these doctors did not have the opportunity to listen to the sworn testimony of the claimant or to observe the claimant's demeanor.

. . . .

A Psychiatric Review Technique dated June 26, 2006, by H. Amando, M.D., a State psychiatric

21

consultant, found that the objective medical
evidence supported a finding that the claimant had
medically determinable dysthymic disorder that was
not severe.  The undersigned . . . considered this
opinion because it was based upon a thorough
review of the evidence and familiarity with Social
Security Rules and Regulations and legal standards
set forth therein.  Although the state agency
consultant opined that the claimant did not have a
severe mental impairment, the claimant's medical
condition indicates severe mental limitations.
Moreover, this doctor did not have an opportunity
to review to [sic] the additional medical evidence
submitted after their evaluations or to listen to
he sworn testimony of the claimant or to observe
claimant's demeanor.

. . . .

10.  Through the dated last insured,
considering the claimant's age, education, work
experience, and residual functional capacity,
there were jobs that existed in significant
numbers in the national economy that the claimant
could have performed.

. . . .

11.  The claimant was not under a disability,
as defined in the Social Security Act, at any time
from December 11, 2002, the alleged onset date,
through December 31, 2007, the date last insured.

(Id. Attach. #2, 27-36 (citations omitted).)

Based on all of the above, Judge Steinman held that Olivera
was not entitled to disability insurance benefits from December
11, 2002, through December 31, 2007, the date he was last insured.
(Id. at 36.)

## V.   STANDARD OF REVIEW

### A.  Generally

To qualify for disability benefits under the Social Security
Act, an applicant must show two things:  (1) He or she suffers
from a medically determinable impairment that can be expected to
last for a continuous period of twelve months or more, or would
result in death; and (2) the impairment renders the applicant

incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West Supp. 2010).  An applicant must meet both requirements to be classified as "disabled."  Id.

Sections 205(g) and 1631(c)(3) of the Social Security Act allow applicants whose claims have been denied by the SSA to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3) (West Supp. 2010).  The Court should affirm the decision unless "it is based upon legal error or is not supported by substantial evidence."  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion[,]" considering the record as a whole.  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It means "'more than a mere scintilla but less than a preponderance'" of the evidence.  Bayliss, 427 F.3d at 1214 n.1 (quoting Tidwell, 161 F.3d at 601).  "'[T]he court must consider both evidence that supports and the evidence that detracts from the ALJ's conclusion . . . .'"  Frost v. Barnhart, 314 F.3d 359, 366-67 (9th Cir. 2002) (quoting Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).

To determine whether a claimant is "disabled," the Social Security regulations use a five-step process outlined in 20 C.F.R. § 404.1520 (2010).  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.

Ukolov v. Barnhart, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting

Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 974 (9th

Cir. 2000)).  Although the ALJ must assist the applicant in

developing a record, the applicant bears the burden of proof

during the first four steps.  Tackett v. Apfel, 180 F.3d 1094,

1098 & n.3 (9th Cir. 1999).  If the fifth step is reached,

however, the burden shifts to the Commissioner.  Id. at 1098.  The

steps for evaluating a claim are as follows:

> **Step 1.**  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.

> **Step 2.**  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.

> **Step 3.**  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.

> **Step 4.**  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.

> **Step 5.**  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the

> burden of showing that there is other work in
> "significant numbers" in the national economy that
> claimant can do:  (1) by the testimony of a vocational
> expert, or (2) by reference to the Medical-Vocational
> Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If
> the Commissioner meets this burden, the claimant is "not
> disabled" and therefore not entitled to disability
> insurance benefits.  If the Commissioner cannot meet
> this burden, then the claimant is "disabled" and
> therefore entitled to disability benefits.

Id. at 1098-99 (footnotes and citations omitted); see also

Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (giving

an abbreviated version of the five steps).

Section 405(g) permits this Court to enter a judgment

affirming, modifying, or reversing the Commissioner's decision.

42 U.S.C.A. § 405(g).  The matter may also be remanded to the

Social Security Administration for further proceedings.  Id.

After a case is remanded and an additional hearing is held, the

Commissioner may modify or affirm the original findings of fact or

the decision.  Id.

"If the evidence can reasonably support either affirming or

reversing the Secretary's conclusion, the court may not substitute

its judgment for that of the Secretary." Flaten v. Sec'y Health &

Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).  Instead, it

must uphold the denial of benefits if the evidence is susceptible

to more than one rational interpretation, one of which supports

the ALJ's decision.  Burch v. Barnhart, 400 F.3d 676, 679 (9th

Cir. 2005).

**B.    For Treating and Examining Physicians**

According to 20 C.F.R. § 404.1527(d), a treating physician's

opinion must be accorded controlling weight if it is "well-

supported by medically acceptable clinical and laboratory

diagnostic techniques and . . . not inconsistent with the other

substantial evidence in [the] case record . . . ."  20 C.F.R. §
404.1527(d)(2) (2010).  If the treating physician's opinion is not
given controlling weight, the following factors are applied to
determine what weight to give the opinion:  (1) the length of the
treatment relationship and the frequency of examination, (2) the
nature and extent of the treatment relationship, (3) the
supportability of the opinion, (4) the consistency of the opinion
with the record as a whole, (5) the specialization of the treating
physician, and (6) any other factors brought to the attention of
the ALJ which tend to support or contradict the opinion.  Id. §
404.1527(d)(2)(I)-(ii), (d)(3)-(6).

   Opinions of treating physicians may only be rejected under
certain circumstances.  See Batson v. Comm'r of Soc. Sec. Admin.,
359 F.3d 1190, 1195 (9th Cir. 2004).  "Cases in [the Ninth
Circuit] distinguish among the opinions of three types of
physicians:  (1) those who treat the claimant (treating
physicians); (2) those who examine but do not treat the claimant
(examining physicians); and (3) those who neither examine nor
treat the claimant (nonexamining physicians)."  Lester v. Chater,
81 F.3d 821, 830 (9th Cir. 1995).

   The standard for determining whether an ALJ properly rejected
the opinion of a treating physician varies.  If the treating
doctor's opinion is not contradicted by another physician, the ALJ
must give clear and convincing reasons for rejecting it.  Thomas
v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); see also Spelatz
v. Astrue, 321 F. App'x 689, 692 (9th Cir. 2009); Lester, 81 F.3d
at 830.

On the other hand, if the treating physician's opinion is contradicted, "[t]he ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'" Batson, 359 F.3d at 1195 (quoting Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); see also Lingenfelter v. Astrue, 504 F.3d 1028, 1042 (9th Cir. 2007). An ALJ may discredit opinions "that are conclusory, brief, and unsupported by . . . objective medical findings." Batson, 359 F.3d at 1195.

"The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester v. Chater, 81 F.3d at 830 (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990); Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984)). Similar to the standard for treating physicians, if the examining doctor's opinion is not contradicted, the ALJ must give clear and convincing reasons for rejecting it. Lester, 81 F.3d at 830. "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31 (citing Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)).

C.    **For Nontreating and Nonexamining Physicians**

"[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). The nonexamining physician's opinion must be "supported by other evidence in the record and [be] consistent with it." Morgan, 169 F.3d at 600.

# VI.   DISCUSSION

A.   **Whether the ALJ's Decision is Free From Legal Error and Based on Substantial Evidence**

The thrust of Plaintiff's Motion for Summary Judgment is that the ALJ erred by failing to properly consider Drs. Fontana, Netter, and Brickman's opinions that Olivera was temporarily, partially psychiatrically disabled for workers' compensation purposes.  (Pl.'s Mot. Summ. J. 5, ECF No. 12.)

Defendant asserts that "whether a Workers' Compensation doctor believes a claimant is 'temporarily' and only 'partially' disabled due to a psychiatric impairment is not particularly probative evidence in the context of a Social Security disability case where a claimant has to prove that he cannot perform any job for at least 12 months."  (Def.'s Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 8 (citation and emphasis omitted), ECF No. 14.)

## 1.   Analyses for Workers' Compensation and Social Security Benefits

Social Security and workers' compensation claims are not the same.  See Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  An administrative law judge should evaluate a doctor's opinions in the proper context.  See id.; but cf. Mejia-Raigoza v. Astrue, Case No. 1:09cv0441 DLB, 2010 WL 1797245, at *7 (E.D. Cal. May 3, 2010) (explaining that an ALJ is not required to translate workers' compensation terminology to a social security setting).  "The categories of work under the Social Security disability scheme are measured quite differently [from the categories under California's workers' compensation program]."  See Desrosiers, 846 F.2d at 576.

1    Findings made in a workers' compensation case are not

2  conclusive in a Social Security case. See Macri v. Chater, 93

3  F.3d 540, 543-44 (9th Cir. 1996)(citing Desrosiers, 846 F.2d at

4  576). "Nonetheless, an ALJ may not ignore a doctor's medical

5  opinion merely because it was issued in the context of a workers'

6  compensation action." Mejia-Raigoza v. Astrue, 2010 WL 1797245,

7  at *7 (citing Lester v. Chater, 81 F.3d at 832; Booth v. Barnhart,

8  181 F. Supp. 2d at 1105).

9    Here, on October 27, 2004, Dr. Brickman found that Olivera

10  was temporarily, partially psychiatrically disabled as stated in

11  his Agreed Medical/Legal Evaluation in Psychiatry made in

12  connection with Plaintiff's workers' compensation claim. (Admin.

13  R. Attach. #7, 532, 544, ECF No. 9.)  On December 17, 2004, Dr.

14  Fontana concluded his initial consultation with Olivera and found

15  Plaintiff was temporarily, partially psychiatrically disabled as

16  part of his workers' compensation analysis. (Id. at 314, 321.)

17  On May 23, 2005, Dr. Netter performed a psychological consultation

18  as part of Olivera's workers' compensation case and stated that

19  Plaintiff was temporarily, partially psychiatrically disabled.

20  (Id. at 554, 566.)  Dr. Netter again reported that Plaintiff was

21  temporarily, partially psychiatrically disabled on October 3,

22  2005, in the psychological treatment report regarding Olivera's

23  workers' compensation case. (Id. at 607, 611.)

24    Administrative Law Judge Steinman addressed Drs. Fontana and

25  Brickman's findings that Olivera was temporarily, partially

26  psychiatrically disabled. (Id. Attach. #2, 32.)  Judge Steinman

27  stated:

28        A treating physician's medical opinion, on the
          issue of the nature and severity of an impairment,

> is entitled to special significance; and, when
> supported by objective medical evidence and
> consistent with otherwise substantial evidence of
> record, entitled to controlling weight.  However,
> statements that a claimant is 'disabled', 'unable
> to work' can or cannot perform a past job, meets a
> listing or the like are not medical opinions but
> are administrative findings dispositive of a case,
> requiring familiarity with the Regulations and
> legal standards set forth therein and in the
> <u>Dictionary of Occupational Titles</u>.  Such issues
> are reserved to the Commissioner.  Furthermore,
> the record fails [to] support the doctor's opinion
> that claimant is incapable of all work.

(<u>Id.</u>)  The judge did not discuss Dr. Netter's opinion that

Plaintiff was temporarily, partially psychiatrically disabled.

But ALJ Steinman properly observed there is a difference between a

disability finding in the workers' compensation context and one

made when deciding eligibility for Social Security benefits.  <u>See</u>

<u>Desrosiers</u>, 846 F.2d at 576.  A finding that Plaintiff was

temporarily, partially psychiatrically disabled for workers'

compensation purposes, is not conclusive here.  <u>See</u> <u>Macri</u>, 93 F.3d

at 543-44 (citing <u>Desrosiers</u>, 846 F.2d at 576).  ALJ Steinman

properly recognized the distinction between Olivera's prior

workers' compensation case and a claim for disability insurance

benefits.  Still, the ALJ's decision must be free of legal error

and supported by substantial evidence.

### 2.   Plaintiff's Mental Limitations

Administrative Judge Steinman explained why Olivera's mental

impairments did not meet or equal any medical listing.

> To satisfy the 'paragraph B' criteria, the mental
> impairment must result in at least two of the
> following:  marked restriction of activities of
> daily living; marked difficulties in maintaining
> social functioning; marked difficulties in
> maintaining concentration, persistence, or pace;
> or repeated episodes of decompensation, each of
> extended duration.  A marked limitation means more
> than moderate but less than extreme.

(Admin. R. Attach. #2, 28.)

The ALJ found that Olivera had mild restriction in his activities of daily living. (Id. at 29.) He cited Dr. Rodriguez's June 17, 2006 report, which stated "that the claimant is able to dress and undress himself, drive a car, run errands, go to the store, cook, participate in household chores, go for walks, watch television, handle cash, and pay bills." (Id.) The judge also cited Dr. Glassman's more recent report, dated February 3, 2009, which noted "that the claimant is able to perform his self grooming, help with household chores, wash dishes, pick up, go grocery shopping, help his wife at the Laundromat, rake leaves, go for walks, and watch television." (Id.)

The administrative law judge found that Olivera had mild difficulties in social functioning. (Id.) "[Plaintiff] reported that he lived with his wife and child, talked over the telephone with people and met them socially, and went to church." (Id.) The ALJ noted Dr. Fontana's report, dated December 17, 2004, disclosed "that the claimant lived with his wife and two children." (Id.) Dr. Glassman's February 3, 2009 report stated "that the claimant was married and worked with his wife in daily activities." (Id.)

Judge Steinman determined that Olivera had moderate difficulties with concentration, persistence, and pace. (Id.) "His cognitive ability and memory are intact and the medical reports indicate that he functions at a higher level that would allow him to do basic work activity." (Id.) ALJ Steinman observed "that the claimant went into great detail answering his adult function report and disability report. This is indicative

1    of an ability to maintain an acceptable level of concentration to

2    perform at least simple tasks." (<u>Id.</u>)  Finally, the judge noted

3    that Olivera "had experienced no episodes of decompensation, which

4    have been of extended duration." (<u>Id.</u>)  Judge Steinman identified

5    evidence to support his finding that Olivera did not have a mental

6    impairment which met or equaled any medical listing. (<u>Id.</u> at 28-

7    29.)  He identified reports, findings, and testimony to support

8    his assessment. (<u>Id.</u>)

9        Olivera asserts that "[t]he ALJ <u>ignored</u> the opinions of Drs.

10   Fontana, Netter, Brickman and Glassman." (Pl.'s Mot. Summ. J. 5

11   (emphasis added), ECF No. 12.)  Even a cursory review of Judge

12   Steinman's decision reveals that he considered the doctors'

13   opinions. (Admin. R. Attach. #2, 29-33, ECF No. 9.)  This is not

14   a case in which the administrative law judge omitted discussion of

15   certain doctors altogether.  Olivera's contention is that the ALJ

16   afforded the doctors' opinions insufficient weight.

17       Plaintiff faults Judge Steinman for not giving adequate

18   weight to the opinions of Drs. Fontana and Netter, and for

19   "failing to provide adequate reasons for his obvious rejection of

20   these opinions." (Pl's Mot. Summ. J. 6, ECF No. 12.)  The

21   administrative law judge found that Plaintiff was "limited to

22   nonpublic, simple, repetitive work that requires limited contact

23   with coworkers." (Admin. R. Attach. #2, 30, ECF No. 9.)  Olivera

24   does not explain what restrictions he believes are appropriate

25   after Drs. Fontana, Netter, Brickman, and Glassman's opinions are

26   afforded more weight.  Plaintiff appears to contend that the

27   Commissioner's denial of benefits should be set aside for legal

28   error and as unsupported by substantial evidence. (Pl's Mot.

Summ. J. 5, ECF No. 12); <u>see</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 458-59 (9th Cir. 2001).  Defendant urges that substantial evidence supports the ALJ's mental capacity finding.  (Def's Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 3, ECF No. 14.)

### 3.   Treating and Examining Physicians

Judge Steinman summarized his reasons for concluding that Olivera did not suffer from a mental disability.  "In terms of the claimant's alleged disabling [mental] impairments, the record fails to document any objective clinical findings establishing that the claimant was not able to perform work in light of the reports of the treating and examining practitioners and the findings made on examination."  (Admin. R. Attach. #2, 31, ECF No. 9.)  The ALJ explained that his decision was based on evidence in the record from Plaintiff's treating and examining doctors.  (<u>Id.</u>)  He identified the specific reports and findings that did not support Olivera's claim of total mental disability.

> Dr. Fontana reported on December 17, 2004, that
> . . . [claimant's] thought processes were logical
> and goal directed and there was no evidence of
> hallucinations or delusions.  He was oriented in
> all spheres and his immediate, recent, and remote
> memory was intact.  Dr. Rodriguez reported on June
> 17, 2006, that the claimant was coherent and
> organized and there was no tangentiality or
> loosening of associations.  He was relevant and
> nondelusional.  He denied any auditory or visual
> hallucinations.  He was alert and oriented in all
> spheres. . . .  Dr. Glassman reported on February
> 3, 2009, that the claimant stated that he could
> perform a very simple job that was not physically
> demanding and would allow him to change position
> frequently.  He had no evidence of anxiety and was
> able to follow instructions.

(<u>Id.</u>)

Judge Steinman cited reports of the treating physician, Dr. Fontana, dated December 17, 2004, and reports of examining

physicians, Dr. Rodriguez, dated June 16, 2006, and Dr. Glassman, dated February 3, 2009. (<u>Id.</u>) The ALJ concluded that the findings in these reports that Olivera was well oriented, had intact memory, showed no evidence of loosening associations, and believed he could perform simple work showed that the objective medical evidence did not substantiate mental limitations to the extent asserted by Olivera. (<u>Id.</u>) Judge Steinman credits the doctors' opinions in these reports. This description of the records that undermine Plaintiff's claim of mental disability identifies substantial evidence supporting the ALJ's decision.

### a. Dr. Fontana

Plaintiff argues that "[t]he ALJ failed to comply with 20 C.F.R. § 416.927 by failing to accord adequate weight to the opinion of the Mr. Olivera's [sic] treating psychiatrist and treating psychologist, Dr. Fontana and Dr. Netter, and by failing to provide adequate reasons for his obvious rejection of these opinions." (Pl.'s Mot. Summ. J. 5-6, ECF No. 12.) Olivera contends that the opinions of these treating physicians deserve controlling weight, and "[e]ven if the ALJ does not find that a treating physician's opinion is entitled to controlling weight, he or she must consider the factors set forth in 20 C.F.R. § 404.1527(d) in evaluating any medical source opinion." (<u>Id</u>. at 6.) Those factors include "length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating physician." (<u>Id.</u> (citation omitted)).

1    Defendant's argues that "[t]he ALJ acknowledged that

2    Plaintiff had been treated by psychiatrist Louis A. Fontana, M.D.,

3    in the context of his Workers' Compensation claim." (Def.'s

4    Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 6 (citation omitted),

5    ECF No. 14.)  Defendant continues, "The ALJ noted that, in

6    December 2004, Dr. Fontana found that, during an hour and a half

7    interview, Plaintiff's thought processes were logical and goal

8    directed, he was fully oriented and had intact immediate, recent

9    and remote memory." (Id. at 6-7 (citation omitted).)

10    Judge Steinman considered Dr. Fontana's opinion that Olivera

11    was temporarily, partially psychiatrically disabled for workers'

12    compensation purposes and gave it "special significance" but held

13    that "the record fails to support the doctor's opinion that the

14    claimant is incapable of all work." (Admin. R. Attach. #2, 32,

15    ECF No. 9.)  The ALJ explained that a doctor's statement that an

16    individual was disabled is not a medical opinion; that

17    determination is reserved to the Commissioner. (Id.)  As

18    discussed above, state disability guidelines for workers'

19    compensation purposes are not determinative in Social Security

20    cases.  Macri, 93 F.3d at 543-44 (citing Desrosiers, 846 F.2d at

21    576).

22    Judge Steinman held that "the record fails to document any

23    objective clinical findings that [Olivera] was not able to perform

24    work . . . . (Admin. R. Attach. #2, 31, ECF No. 9.)  The

25    administrative law judge considered tests performed by Dr. Zink on

26    October 12, 2004, that showed Olivera's concentration was not

27    significantly impaired, his memory was not impaired, his visual

28    scanning/speed was a little lower than expected, and his

intelligence was borderline to low average.  (Id. at 33.)  The ALJ
reviewed October 11, 2006 reports by doctors Brickman and Zink
that Olivera's concentration and visual scanning/speed was not
substantially impaired, his memory was unimpaired, and his
intelligence was low average to average.  (Id.)

Judge Steinman gave Dr. Fontana's opinion special
significance but noted the difference between a disability finding
for workers' compensation purposes and Social Security benefits;
he also found that the objective medical evidence did not support
the level of disability claimed by Plaintiff.  These are specific,
legitimate reasons for disregarding Dr. Fontana's conclusions.
Batson, 359 F.3d at 1195.  The ALJ's decision was supported by
substantial evidence.

### b.   Dr. Glassman

Plaintiff states that "Dr. Glassman opined that it would be
difficult for Mr. Olivera to return to productive full time work
given his combination of problems and it would be difficult for
him to return to strenuous, physical labor." (Pl.'s Mot. Summ. J.
7, ECF No. 12.)  Plaintiff notes that Dr. Glassman gave him a GAF
score of fifty and found depression and anxiety would make it
unlikely that Olivera could retrain to a nonphysical employment.
(Id.)  Olivera was further impaired because he had limited
intellectual functioning.  (Id.)  Plaintiff concludes, "It was
error for the ALJ to ignore the opinion of Dr. Glassman."  (Id.)

Defendant explains that the administrative law judge
"acknowledged that, in February 2009, Plaintiff was evaluated by
Jaga N. Glassman, M.D." (Def.'s Cross-Mot. Summ. J. Attach. #1
Mem. P. & A. 5 (citation omitted), ECF No. 14.)  Defendant noted

that "Dr. Glassman's evaluation was done more than two years after
Plaintiff was last insured for [disability insurance benefits]."
(Id.)  Although Dr. Glassman found that it would be difficult for
Olivera to perform full-time work, the doctor also "found
Plaintiff was able to care for himself, help with household
chores, wash dishes, do some 'picking up,' grocery shop, help his
wife at the Laundromat, rake leaves and go for walks." (Id.
(citation omitted).)  Olivera told Glassman that he might be able
to perform a very simple job, he had not been to the doctor in a
while, and he stopped taking medications because they were too
expensive but he failed to seek assistance from "County mental
health services." (Id.)  For all of these reasons, Defendant
contends that the ALJ's decision is supported by substantial
evidence.  (Id.)

Dr. Glassman did not examine Olivera until well after the
last date he was eligible for disability benefits. (Admin. R.
Attach. #2, 27, 31, ECF No. 9.)  The doctor saw Plaintiff "at the
request of the California Department of Social Services for a
psychiatric disability evaluation." (Id. at 28.)  Judge Steinman
noted Dr. Glassman's conclusions.  "[T]he claimant stated that he
could perform a very simple job that was not physically demanding
and would allow him to change position frequently.  He had no
evidence of anxiety and was able to follow instructions." (Id. at
31.)  The ALJ discussed Dr. Glassman's report:

> Dr. Glassman reported on February 3, 2009,
> that the claimant had a GAF of 50 and that it
> would be difficult for him to return to productive
> full time work given his combination of problems
> and it would be difficult for him to return to
> strenuous, physical labor.  His ongoing depression
> and anxiety was likely to impair his ability to
> retrain successfully in a nonphysical type of

1          employment.  He had limited intellectual
           functioning that further impaired his capacity for
2          flexibility and adaptability and creative change.

3     (Id. at 33)(citation omitted).)

4          The ALJ concluded his discussion of the experts by stating

5     that he considered "these opinions because based on a thorough

6     review of the evidence and familiarity with Social Security Rules

7     and Regulations and legal standards set forth therein."  (Id.)

8     The judge added, "Although the state agency consultants opined

9     that the claimant had first no mental limitations and then

10    disabling mental impairments, the claimant's medical condition

11    indicates moderate limitations.  Moreover, these doctors did not

12    have the opportunity to listen to the sworn testimony of the

13    claimant or to observe the claimant's demeanor."  (Id.)

14         The administrative law judge credited Dr. Glassman's February

15    3, 2009 report and findings, even though it was prepared after the

16    disability period.  The ALJ did not give significant weight to Dr.

17    Glassman's GAF assessment and conclusion that it would be

18    "difficult" for Olivera to return to work, or his finding that

19    Plaintiff had "limited intellectual functioning."  (Id.)  A GAF

20    assessment alone cannot establish disability.  See Morgan v.

21    Comm'r Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  Judge

22    Steinman found "minimal clinical evidence to corroborate or

23    support any finding of significant vocational impact related [to

24    Olivera's other diagnosed conditions.]

25         The law does not "require the ALJ to evaluate in writing

26    every piece of testimony and evidence submitted."  Zalewski v.

27    Heckler, 760 F.2d 160, 166 (7th Cir. 1985).  Courts only require a

28    "minimal level of articulation by the ALJ as to his assessment of

the evidence . . . ."  Id.  Judge Steinman met this threshold.  He gave specific, legitimate reasons for failing to give all aspects of Dr. Glassman's consultative medical evaluation significant weight.  See Batson, 359 F.3d at 1195.  The contention that Judge Steinman ignored Dr. Glassman's opinion is plainly incorrect.  (See Pl's Mot. Summ. J. 7.)

### c.  Dr. Netter

Plaintiff argues that "[t]he ALJ failed to comply with 20 C.F.R. § 416.927 by failing to accord adequate weight to the opinion of . . . Mr. Olivera's treating psychiatrist and treating psychologist, Dr. Fontana and Dr. Netter, and by failing to provide adequate reasons for his obvious rejection of these opinions."  (Id. at 5-6.)

Defendant states, "The ALJ acknowledged that Roberto Netter, Ph.D., had assessed a GAF score of 50."  (Def.'s Cross-Mot. Summ. J. Attach. #1 Mem. P. & A. 7, ECF No. 14.)  Defendant concedes that "[t]he ALJ did not address Dr. Netter's findings in further detail."  (Id. (citation omitted).)  He explains that Dr. Netter's finding that Olivera could not return to his past work is not in dispute.  (Id.)  Defendant asserts that the doctor's opinion that Olivera should not engage in work that would lead to increased psychologically-mediated pain or increased anxiety or depression is consistent with the administrative law judge's decision.  (Id.)  "The ALJ's limiting Plaintiff to simple, repetitive work that had little contact with co-workers adequately accounts for these limitations; thus, any error this court might attribute to he ALJ's treatment of Dr. Netter's opinion is harmless."  (Id. (citation omitted).)

1     In his decision, ALJ Steinman stated, "As for the opinion
2 evidence, Robert Netter, Ph.D., reported on June 15, 2005, that
3 the claimant had a GAF of 50." (Admin. R. Attach. #2, 32
4 (citation omitted), ECF No. 9.) "On September 26, 2006, Stephen
5 F. Signer, reported that the claimant had a GAF of 50-60.  Dr.
6 Brickman reported on October 31, 2006, that the claimant had a GAF
7 of 63.5." (Id. (citations omitted).)  The administrative law
8 judge concluded, "Pursuant to 20 CFR § 404.1527 and Social
9 Security Ruling 96-2p, the undersigned assigns significant weight
10 to [Dr. Brickman's] opinion, as it is well-supported by the
11 medical evidence finding that the claimant has moderate mental
12 impairment symptoms." (Id.)

13     The ALJ considered Dr. Netter's opinion but assigned it less
14 weight than Dr. Brickman's.  Judge Steinman did not give any
15 reasons for discounting Dr. Netter's opinion regarding the GAF
16 score, other than his finding that Dr. Brickman's opinion was
17 well-supported by the evidence. (Id.)  Dr. Brickman had conducted
18 an agreed medical evaluation of Olivera and issued his report on
19 October 27, 2004, and then again two years later, on October 31,
20 2006. (Id. Attach. #7, 532; Attach. #8, 656, 663.)

21     As discussed above, if the treating physician's opinion is
22 contradicted, "[t]he ALJ must give specific, legitimate reasons
23 for disregarding the opinion of the treating physician.'"  Id.
24 (quoting Matney, 981 F.2d at 1019); see also Lingenfelter, 504
25 F.3d at, 1042.  The ALJ failed to do so with regard to Dr.
26 Netter's GAF assessment.  The judge's preference for a different
27 psychologist's opinion alone does not set forth adequate "specific
28 [and] legitimate reasons for disregarding the opinion of the

treating physician.'" <u>Batson</u>, 359 F.3d at 1195.  Defendant argues

this is harmless error.  (Def.'s Cross-Mot. Summ. J. Attach. #1

Mem. P. & A. 7 (citing <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1006 n.6

(9th Cir. 2005), ECF No. 14.)

    "[T]he Commissioner has determined that the GAF scale 'does

not have a direct correlation to the severity requirements in [the

Social Security Administration's] mental disorders listings.'"

<u>Esquer v. Astrue</u>, No. 08cv636BTM(AJB), 2009 U.S. Dist. LEXIS

121583, at *11 (S.D. Cal. Dec. 31, 2009 (citing 65 Fed. Reg.

50,746, 50,765 (Aug. 21, 2000)).  "A GAF between 41 and 50

indicates serious symptoms (e.g. suicidal ideation, severe

obsessional rituals, frequent shoplifting) or any serious

impairment in social, occupational, or school functioning (e.g.,

no friends, unable to keep a job)."  <u>Morgan v. Comm'r Soc. Sec.</u>

<u>Admin.</u>, 169 F.3d at 598 n.1.  "Expressed in terms of degree of

severity of symptoms or functional impairments, GAF . . . scores

of 51 to 60 represent 'moderate', [and] scores of 61 to 70

represent 'mild[]' . . . . "  <u>Hemp v. Astrue</u>, No. 2:09cv34MLM,

2010 U.S. Dist. LEXIS 59697, at 33 n.3 (E.D. Mo. June 16, 2010).

    On June 15, 2005, Dr. Netter assigned Olivera a "current" GAF

score of fifty and found that he was temporarily, partially

psychiatrically disabled for workers' compensation purposes.

(Admin. R. Attach. #8, 565-66, 568.)  Dr. Netter discussed the

"Need for Vocational Rehabilitation & Work Restrictions."  (<u>Id.</u> at

567.)

> It is reasonable to expect that Mr.
> [Olivera] will not be able to return to his
> customary duties, secondary to residual
> symptoms of Posttraumatic Stress Disorder.  At
> this time, he is precluded from engaging in
> work that would lead to increased

> psychologically-mediated exacerbated physical
> pain, for such will lead to increased anxiety
> and depression, and maintenance of this
> vicious cycle . . . .
>
> . . . .
>
> At this time it is anticipated that
> treatment goals will be reached with
> approximately 18 combined individual and group
> treatment sessions.

(Id.)  Dr. Netter's 2005 finding that Olivera was temporarily, partially disabled is not inconsistent with the administrative law judge's 2009 decision that Plaintiff was capable of simple, repetitive work and could have limited contact with coworkers.

"While a GAF score may be of considerable help to the ALJ in formulating the RFC [residual functional capacity], it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."  Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002).  Thus, it was harmless error for the ALJ to fail to explain his reasons for discrediting Dr. Netter's GAF assessment because that opinion did not establish mental disability or affect the result in this case.  See Ukolov, 420 F.3d at 1006 n.6.  The mental limitations that Judge Steinman placed on Olivera do not conflict with Dr. Netter's statement that Plaintiff should not perform work that would increase his anxiety, depression, or mentally-induced pain, because the jobs identified by the ALJ fit within Olivera's residual functional capacity.

A court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  Burch, 400 F.3d at 679.  Dr.

1  Netter's description of workplace options for Plaintiff is

2  consistent with the ALJ's decision.

3      ALJ Steinman failed to provide specific and legitimate

4  reasons for preferring Dr. Brickman's GAF assessment over Dr.

5  Netter's and omitting Dr. Netter's findings that Olivera was

6  temporarily, partially psychiatrically disabled for workers'

7  compensation purposes, but any error was harmless.

8              **d.   Dr. Brickman**

9      Plaintiff argues that Dr. Brickman found Olivera was

10  temporarily, partially psychiatrically disabled for two years due

11  to (1) posttraumatic stress disorder, (2) adjustment disorder with

12  depressed mood, (3) pain disorder associated with both

13  psychological factors and a general medical condition, and (4)

14  anxiety disorder. (Pl.'s Mot. Summ. J. 6, ECF No. 12.) "It was

15  incumbent on the ALJ to weigh these opinions in his decision."

16  (Id. at 6-7.)

17      Defendant argues that the administrative law judge properly

18  evaluated Dr. Brickman's opinion. (Def.'s Cross-Mot. Summ. J.

19  Attach. #1 Mem. P. & A. 6, ECF No. 14.) "The ALJ noted J. Brand

20  Brickman, M.D., assessed a GAF score of 63.5 in October 2006,

21  which is consistent with only moderate symptoms, not disabling

22  symptoms." (Id. (citations omitted).) "The ALJ further noted

23  that, also in October 2006, Dr. Brickman opined that Plaintiff did

24  not appear to have substantially impaired concentration and his

25  memory was unimpaired." (Id. (citation omitted).)

26      The administrative law judge observed that "Dr. Brickman

27  reported on October 31, 2006, that the claimant had a GAF of

28  63.5." (Admin. R. Attach. #2, 32, ECF No. 9.) The ALJ concluded,

"Pursuant to 20 CFR § 404.1527 and Social Security Ruling 96-2p, the undersigned assigns significant weight to [Dr. Brickman's] opinion [of Olivera's GAF score], as it is well-supported by the medical evidence finding that the claimant has moderate mental impairment symptoms." (Id.) Judge Steinman gave this aspect of Dr. Brickman's conclusions significant weight.

In his decision, ALJ Steinman explains that "Dr. Brickman and Dr. Zink reported on October 11, 2006, that the claimant did not appear to have substantially impaired concentration or visual scanning/speed, unimpaired memory, and IQ functioning in the low average to average range." (Id. at 33.)  The judge stated his reasons for giving these opinions significant weight:

> Pursuant to 20 CFR § 404.1527, the undersigned assigns significant weight to these examining doctor's opinions, as they are well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable basis for claimant's chronic symptoms and resulting limitations.  Moreover, their opinions are not inconsistent with other substantial evidence of record.

(Id.)

Plaintiff's argument that Dr. Brickman was not afforded sufficient weight appears to focus on the doctor's 2004 report. (Compare Pl's Not. Summ. J. 6-7, ECF No. 12, with Admin. R. Attach. #7, 543-44, ECF No. 9.)  The ALJ deferred to opinions contained in Dr. Brickman's 2006 report.  In 2004, The doctor stated that Olivera was temporarily, partially psychiatrically disabled and required psychiatric treatment.  (Admin. R. Attach. #7, 544, ECF No. 9.)  In 2006, he noted that Plaintiff had "received considerable benefit from his contacts with Dr. Netter .

1  . . ." (Id. at 639.)  Dr. Brickman discussed Olivera's mental

2  condition.  "I do not believe that Mr. [Olivera], on the basis of

3  a work-related, purely Psychiatric Disability, is currently

4  incapable of returning to his usual and customary occupation . . .

5  ."  (Id.)  The ALJ discussed the 2004 and 2006 reports.  (Id.

6  Attach. #2, 32-33.)  Judge Steinman did not err by affording Dr.

7  Brickman's 2006 opinion more weight.

8        **4.   Other Disabling Conditions**

9     Plaintiff also argues that "the ALJ failed to consider all of

10  Mr. Olivera's disabling conditions."  (Pl.'s Mot. Summ. J. 7, ECF

11  No. 9.)  Plaintiff contends that it was error for Judge Steinman

12  to find Olivera suffered from depression and not (1) posttraumatic

13  stress disorder, (2) adjustment disorder with depressed mood, (3)

14  pain disorder associated with both psychological factors and a

15  general medical condition, (4) anxiety disorder, (5) panic

16  disorder with phobic avoidance, and (6) borderline intellectual

17  functioning.  (Id.)  He states that the judge's finding that these

18  conditions had minimal clinical evidence to corroborate them was

19  insufficient, and the ALJ should have considered them in

20  combination.  (Id.)

21     Defendant argues that Plaintiff has failed to show he was

22  disabled due to "other psychiatric conditions that were diagnosed

23  at one time or another."  (Def.'s Cross-Mot. Summ. J. Attach. #1

24  Mem. P. & A. 9 (citation omitted), ECF No. 14.)  Defendant alleges

25  that none of those other conditions were disabling "as the

26  Commissioner has never found Plaintiff to be disabled and

27  Plaintiff cannot overcome that fact by characterizing diagnoses as

28  'disabling.'"  (Id. (citation omitted).)  Also, "a diagnosis is

1   not evidence of disability." (Id. (citation omitted).) "Finally,

2   Plaintiff fails to explain what additional limitations the ALJ

3   might have assessed based on any of the diagnoses to which he

4   refers." (Id.)

5      "[A] claimant carries the initial burden of proving a

6   disability." Burch v. Barnhart, 400 F.3d at 683 (citing Swenson

7   v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).) Claimants may

8   prove their disability with medical opinions, defined as

9   "statements from physicians and psychologists or other acceptable

10  medical sources." 20 C.F.R. §§ 404.1527(a), 416.927(a) (West

11  2008). "An ALJ is not required to discuss the combined effects of

12  a claimant's impairments or compare them to any listing in an

13  equivalency determination, unless the claimant presents evidence

14  in an effort to establish equivalence." Burch, 400 F.3d at 683

15  (citing Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).)

16     Here, Olivera faults Judge Steinman for failing to consider

17  the combined effects of posttraumatic stress disorder, adjustment

18  disorder with depressed mood, pain disorder associated with both

19  psychological factors and a general medical condition, anxiety

20  disorder, panic disorder with phobic avoidance, and borderline

21  intellectual functioning, but he does not identify which medical

22  listing he believes these multiple diagnoses meet or equal. It is

23  Plaintiff's initial burden to prove his alleged disability.

24  Burch, 400 F.3d at 683. Merely asserting the ALJ should not have

25  fragmentize the effects of Olivera's diagnoses is insufficient.

26  Id.

27     The ALJ must consider whether the combination of impairments

28  is the medical equivalence of a listed impairment. Lester v.

Chater, 81 F.3d at 829.  Here, Judge Steinman concluded that Olivera did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Admin. R. Attach. #2, 28, ECF No. 9.)  The ALJ discussed the Plaintiff's difficulties and limitations.  (Id. at 28-30.)  "The complainant is required to offer a theory as to how the combined effect of [his] impairments equal a listed impairment."  Coley v. Astrue, CV09-3050-PK 2010 U.S. Dist. LEXIS 83077, at *58 (D. Or. Aug. 12, 2010)(citing Lewis v. Apfel, 236 F.3d at 514).  Olivera has not "pointed to evidence that shows that his combined impairments equal a listed impairment."  Lewis, 236 F.3d at 514.  "The ALJ satisfied his duty to support his conclusion that the combined effect of [Olivera's] impairments did not meet or equal a listed impairment by providing an in depth analysis of the medical record."  Coley, CV09-3050-PK, 2010 U.S. Dist. LEXIS 83077, at *59.  The claim that the administrative law judge erred in failing to consider the combined effects of Olivera's other diagnoses is without merit.

## VII.   CONCLUSION AND RECOMMENDATION

"The decision of the Commissioner must be upheld if it is supported by substantial evidence and if the Commissioner applied the correct legal standards."  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003) (citing Pagter v. Massanari, 250 F.3d 1255, 1258 (9th Cir. 2001)).  If the AlJ's decision is not supported by substantial evidence, remand or reversal is appropriate.  Gallant v. Heckler, 753 F.2d 1450, 1457 (9th Cir. 1984).

1       For the reasons stated above, the Court recommends **DENYING**

2  Plaintiff's Motion for Summary Judgment [ECF No. 12], and **GRANTING**

3  Defendant's Cross-Motion for Summary Judgment [ECF No. 14].

4       This Report and Recommendation will be submitted to the

5  United States District Court Judge assigned to this case, pursuant

6  to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file

7  written objections with the Court and serve a copy on all parties

8  on or before December 14, 2010.  The document should be captioned

9  "Objections to Report and Recommendation."  Any reply to the

10  objections shall be served and filed on or before January 4, 2011.

11  The parties are advised that failure to file objections within the

12  specified time may waive the right to appeal the district court's

13  order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15  DATED: November 22, 2010

                    Ruben B. Brooks
16                    United States Magistrate Judge

16  cc:  Judge Sammartino
17      All Parties